Robert A. KEETON, Plaintiff,

v.

AMERICAN TELEPHONE AND TELEGRAPH COMPANY, Defendant.

No. 91 Civ. 5763 (WK).

United States District Court, S.D. New York.

Nov. 10, 1993.

Laura S. Schnell, Vladeck, Waldman, Elias & Engelhard, New York City, for plaintiff.

Charles M. Mattingly, American Tel. and Tel. Co., New York City, for defendant.

## AMENDED OPINION AND ORDER

WHITMAN KNAPP, Senior District Judge.

In this Title VII case defendant has moved for judgment notwithstanding the verdict or, in the alternative, for a new trial. This motion comes before me in a peculiar procedural setting.

Due to a calendar crisis, the case was assigned to me a few days before the trial started. Upon my first meeting with counsel, they, in an off-the-record conference, explained their respective positions. The basic position of plaintiff, a black[1] male, was that after twenty-four years of loyal and unblemished service he had been forced to take early retirement on the wholly pretextual ground that he had improperly used for personal purposes a corporate American Express card. To the best of my recollection, plaintiff did not seriously contend that there was anything in the actual conduct of one Paul Corrao, the superior claimed so to have forced him to take early retirement, which suggested racial motivation. Counsel argued that a jury could infer such motive from two circumstances:

(1) Some six months after Corrao had forced this early retirement, he was asked to provide an explanation for his conduct to the EEOC, and had proceeded to give concededly inaccurate (claimed by plaintiff to have been willfully false) explanations, which inaccurate (or false) explanations he repeated under oath in a deposition taken in this action.

(2) In 1988 when Corrao had accepted plaintiff into his unit as a supervisory employee, five such supervisory employees (including plaintiff) were black and five others white; but by 1989 when Corrao forced plaintiff into early retirement, he was the only remaining black supervisor, the other four having (for a variety of reasons) left the unit and having been replaced by whites.

Again according to my best recollection, defendant's counsel—although not conceding that plaintiff's evidence would establish a prima facie case—showed no disposition to argue the point. On the contrary, he indicated that he was confident that the evidence of justification which he planned to submit would be so overwhelming as to entitle defendant corporation to a directed verdict. Whether or not my recollection is correct about that preliminary conference, the subsequently created record establishes that my foregoing statement accurately reflects the positions ultimately taken by the respective parties. Although never formally conceding the existence of a *prima facie* case, defendant's counsel made no serious effort to convince me or the jury that one did not exist. He relied wholly on his confidence in the explanatory evidence. This confidence proved to be unwarranted. The jury's verdict for the plaintiff contained, among other things, an award of $100,000 in punitive damages.

On July 23rd, on the argument of defendant's instant motion, I advised the parties that I was satisfied that a *prima facie* case existed, and so could not grant the motion for a judgment n.o.v.; but that I thought it probable that defendant had established that no jury could rationally reject what seemed to me convincing and uncontradicted explanatory evidence, and that defendant's alternative request for a new trial might well be granted. After the careful examination of the evidence required for decision on defendant's motion, I have become convinced that defendant is indeed entitled to Judgment Notwithstanding the Verdict. Also I continue to believe, although for different reasons than the one I then stated, that should such relief be denied defendant would be entitled

---

[1] Both parties, in their respective briefs and summations, and plaintiff in his testimony, have in general used the terms "black" and "white" to designate race. I shall do the same.

to the alternative relief of a new trial. For reasons that will follow, I now find:

(1) There is indeed nothing about the conduct actually involved in Corrao's pressuring plaintiff to take early retirement that in any way suggests race as a motivating factor.

(2) The facts adduced concerning the departure of the four black supervisors from Corrao's unit, viewed most favorably to plaintiff's position, do not in any way suggest racial motive on Corrao's part.

(3) These two factual findings show that—apart from any inference that might be drawn from Corrao's allegedly false explanations—the evidence adduced in no way suggested that plaintiff was fired "in circumstances giving rise to an inference of discrimination." *Rosen v. Thornburgh* (2d Ct.1991) 928 F.2d 528, 532.

(4) In light of these factual findings and of the law as most recently enunciated in *Hicks v. St. Mary's* (1993) 506 U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407, no impression any juror might have derived from Corrao's allegedly false statements *could be used in this lawsuit against defendant corporation.*

I have therefore concluded that defendant is entitled to a judgment not withstanding the verdict. I have also concluded—for reasons I shall later explain—that if the Court of Appeals were to reverse the grant of judgment of n.o.v., defendant would be entitled to the alternative relief of a new trial.

Aside from contesting the correctness of these two conclusions, plaintiff contends that defendant—by its above-described strategy—has "waived its right to seek judgment n.o.v." (Pl.Mem. p. 17). As will be explained, I reject that contention.

There is also a collateral matter which must be considered. I am the trustee of a family trust having a total value of about $4,600,000. Due to the above mentioned calendar crisis, I started the trial of this case without taking the usual precaution of having my minute clerk examine his list of trust assets (and my own assets) to avoid the risk of conflict. Accordingly it was not until after

returning from vacation this September, and seeing a memorandum prepared for my signature recusing myself in another case involving this corporate defendant, that I came to realize that since the latter part of 1992 the trust had held 1220 shares of American Telephone and Telegraph Company stock, which shares constitute 1.66 per cent of the total value of the trust and .000090571 per cent of the 1,347,007,000 outstanding shares of AT & T stock.[2] I immediately notified the parties, and plaintiff made a timely request that I recuse myself. For reasons which follow, I deny that request.

### Procedural History

On May 11, 1990, plaintiff signed an EEOC Charge of Discrimination against defendant corporation in which he asserted that he "was forced to retire or be fired because of race and age ..." A complaint containing this and similar allegations was filed in the Southern District of New York on August 23, 1991. The case fell to Judge David N. Edelstein, with Magistrate Judge Michael H. Dolinger assigned to oversee discovery. An amended complaint omitting the charge of age discrimination was filed on April 13, 1992. In a letter dated May 26, 1992, plaintiff informed the Magistrate Judge of the parties' progress in discovery:

Plaintiff and defendant have each deposed one witness and plaintiff anticipates no further depositions. Plaintiff has also responded to defendant's requests for documents and defendant has made no additional requests in that regard.

By memo endorsement dated August 20, 1992, the Magistrate Judge directed that the parties within six days submit a Pretrial Order. In such Joint Pre-trial Order, filed four days later and subsequently admitted in evidence as Defendant's Exhibit E, plaintiff asserted that it would call six witnesses, three of whom were expected to testify as follows (Def.Ex.E, p 7, emphasis added):

Vivienne Crier is black and worked for defendant for approximately 17 years, most recently as a technician. Corrao was her immediate supervisor. *She is expected*

---

**2.** This information was supplied by a letter from the Bessemer Trust Company, financial advisor to the trust. I have ordered that such letter be made part of the record of this case.

*to testify about Corrao's discriminatory treatment of her.*

Walter Anderson is black and worked for defendant for approximately 17 years, most recently as a supervisor at the White Plains Remote Work Center. Corrao was his immediate supervisor. *He is expected to testify about Corrao's discriminatory treatment of him.*

Theodora Hamer is black and worked for defendant approximately 13 years, most recently as a supervisor at the White Plains Remote Work Center. Corrao was her immediate supervisor. *She is expected to testify about Corrao's discriminatory treatment of her.*

On October 8, 1992 the case was reassigned to Judge Miriam G. Cedarbaum. As of January 8, 1993, it was placed on Judge Cedarbaum's Ready Trial Calendar on 48 hours notice. Judge Cedarbaum became ill on the eve of the scheduled trial. On February 11—at the request of the District Executive—I assumed responsibility, and there followed the above noted off-the-record conference with counsel.

At the close of plaintiff's case defendant's counsel agreed with my suggestion that we defer legal arguments to some time when the jury would not be kept waiting, but only if it was clear that he was "preserving his motion." (Tr. 234, and see my observation at Tr. 247).

In its motion for a directed verdict at the close of plaintiff's case, defendant made the following statement regarding whether or not a *prima facie* case had been established:

The critical prong that's missing from the plaintiff's case is evidence or indicia to suggest that what happened to Mr. Keeton happened because of his race ... (Tr. 284)

I'd argue that there is no *prima facie* case, but there is really not point to that since we have ... articulated a legitimate non-discriminatory reason for the treatment that Mr. Keeton received. (Tr. 284–85)

I reserved decision on this motion and submitted the case to the jury, noting that a verdict in favor of plaintiff would engender

"a very difficult decision to make, whether or not to set it aside." (Tr. 291–292).

In a charging conference towards the close of the evidence, I advised the parties that, having heard no arguments from either side relating to this issue, I would not be submitting a charge relating to the establishment of a *prima facie* case. Defendant offered no objection. When charging the jury, I—without objection by defendant—instructed the jury as follows regarding Corrao's claimed false statements (Tr. 377):

... if you accept plaintiff's position and conclude that the misdescription was deliberate and was done for the purpose of concealing some misconduct, you may, if you wish, conclude that he knew his conduct had been unlawful and that that is why he tried to disguise it. And *you may, if you wish, treat his misrepresentation as an indication that he had indeed a dishonest motive in his conduct toward plaintiff and that such motive was to mistreat Mr. Keeton because of his race.*

I made no reference to the necessity of establishing of a *prima facie* case before such an inference could be drawn, nor did defendant request any such reference.

Following the verdict, defendant moved for a Judgment Notwithstanding the Verdict or for a New Trial. At oral argument on that motion I opened the proceeding with the following observation to plaintiff's counsel:

Before we start I would like to ask you a question about the fact that all the black employees disappeared in the term of [plaintiff's] employment. In your pretrial order you say you are going to call Vivienne Crier, Walter Anderson and Theodora Hamer to support that assertion, and in your opening statement you more or less described their expected testimony, and then you don't call them. The inference I draw is you knew they weren't going to say that (Tr. p. 2)

I then inquired:

Why am I not entitled to assume that you knew they weren't going to testify to that? (Tr. p. 3).

In answer to that question, counsel explained that because of information provided

by plaintiff and other potential witnesses, Walter Anderson had not even been interviewed (Tr. p. 4). She further stated that she could not comment on why the other listed potential witnesses had not been called because information received from plaintiff in this regard was protected by the attorney-client privilege (*id.*).

## The Evidence

As above indicated, plaintiff does not seriously dispute that—apart from any inference that might be drawn from Corrao's erroneous (or false) earlier statements—the stated reason for his forced retirement, misuse of his corporate credit card, does not suggest racial discrimination. I shall therefore briefly state in narrative form the evidence pertinent to that issue, and shall subsequently discuss in greater detail the testimony relating to the departure of the black supervisors.

### A. Evidence Relating to Plaintiff's Misuse of His Credit Card

Upon receiving a corporate American Express card, AT & T employees sign an agreement which states in relevant part: "I ... will use the charge card for Company business only," and provides that misuse of the card "may result in disciplinary action ... up to and including dismissal." (Pl.Ex. 4). Defendant could not effectively dispute that prior to plaintiff's forced retirement this policy had not been enforced in a uniform fashion. An AT & T internal security newsletter indicates that of the over 100 employees disciplined in 1989 for card misuse, only half were dismissed or resigned (Pl.Ex. 20). In addition, a form letter which AT & T routinely sent to employees who were late in paying their American Express Card bills included an admonishment to "SUBMIT YOUR PERSONAL PAYMENT TO AMERICAN EXPRESS *FOR NON–VOUCHERABLE PERSONAL CHARGES.*" (Pl.Ex. 26, capitalization in original, emphasis added).

At trial, Robert A. Brickmeier ("Brickmeier"), a retired senior AT & T manager who had been Corrao's immediate superior during the pertinent time period, testified that in July of 1989 he was notified by American Express and AT & T's accounting department of an outstanding balance of approximately $1000 incurred by an employee in one of Brickmeier's units. This employee, referred to throughout the trial as "FC," happened to be white. Brickmeier ordered an investigation of the "FC" matter which revealed that he had used his card for personal expenses (Tr. 240). Brickmeier made it clear that he was prepared to dismiss FC because of the card misuse but, upon his request, allowed him to retire (Tr. 244). FC had been a non-management employee for 27 years, and was a union member. His forced retirement led to the filing of a union grievance on his behalf (Tr. 244–45). Faced with this union grievance, Brickmeier ordered all of his managers, including Corrao, to review the American Express corporate card records of their respective staffs (Tr. 243–44). This inquiry revealed that although there were no outstanding charges with respect to plaintiff's card, he appeared to have used it for personal expenses (Tr. 179). Confronted with this state of affairs, Corrao first obtained from Brickmeier a commitment that plaintiff would be allowed voluntarily to retire as F.C. had, and then pressured plaintiff to avail himself of that opportunity. Corrao did not—as required by defendant corporation's procedures—ask Brickmeier's permission to fire plaintiff (Tr. 163, 252), or seek advice from AT & T's Equal Opportunity Coordinator or legal department (Tr. 165–66; Pl.Ex. 6).

### B. Evidence Relating to The Departure of the Black Supervisors

Plaintiff testified that he had joined the unit run by Corrao, the Remote Work Center ("Corrao's unit"), in order to learn the new digital technology which he considered important to his career (Tr. 44). Walter Anderson, another black supervisor who was then working for Corrao, had recommended the unit to plaintiff as a good place to gain such expertise (Tr. 118). Plaintiff was accepted by Corrao after an interview, and began working for him in January of 1988 (Tr. 119).

At the beginning of his tenure with the unit, there were four other black supervisors besides plaintiff, and five white supervisors.

He asserted that all four of the black supervisors were "forcibly downgraded, forcibly transferred, quit and went to other companies." (Tr. 71). On direct examination, he testified that Vivienne Crier, a seventeen-year AT & T employee, was downgraded by Corrao from a management to a technical position (Tr. 71–71). On cross examination he admitted that he had never discussed this change with Ms. Crier (Tr. 121–122). On direct examination plaintiff said that Harold Christian, another seventeen year employee, "had to take" a transfer out of the unit to another AT & T location after Corrao "told him that he had no future within the organization." (Tr. 72). On cross-examination he acknowledged that at no time during any of his discussions with Christian had the latter "attached being black" to any statements he made about his transfer (Tr. 123). On direct examination plaintiff testified that Walter Anderson and Theodora Hamer, who had worked for defendant corporation for seventeen and thirteen years respectively, had both resigned in 1989 to move to New York Telephone. Cross examination revealed that both had done this for "better job[s]", and that neither had suggested to plaintiff that Corrao had ever behaved badly to either due to his or her race (Tr. 122). Plaintiff also indicated on cross-examination that a black employee in Corrao's unit had been promoted to a supervisory position after plaintiff's departure (Tr. 123). Introduced into plaintiff's cross-examination was a deposition statement to the effect that prior to the time he was first questioned about his American Express card, he had never had the feeling that Corrao had treated him poorly because of his race. (Tr. 119).

When asked on direct if he had been aware in the fall of 1989 of rumors that Corrao's unit would soon be shut down, plaintiff answered that he had been aware of such predictions, although he did not recall hearing them in September (Tr. 120–121). As will be discussed below, plaintiff on November 13 wore a tape recording device in order to record a conversation which he anticipated having with Corrao regarding his forced retirement. The transcript of this tape, offered into evidence by plaintiff, recorded a conversation which appeared to have taken place outside Corrao's office between plaintiff and an unidentified male, whom plaintiff did not suggest to have been a member of a minority group. That conversation included the following (Pl.Ex. 2A p 2–4):

Keeton: How long are they going to give this organization?

M/Voice: Oh, they're talking about ... well, we're supposed to be hearing officially in a couple of weeks what's going to happen. But, it's definitely, they say that this place is not going to be here. It's either going to be in Atlanta or Denver ...

Keeton: Are they going to start getting rid of people, or what?

M/Voice: They are already _____ off, people are worrying that bought time with seniority can bump other people downstairs _____. Well, everybody's worried now, you know, all the old _____.

Keeton: That's a shame.

Called by plaintiff as a "hostile witness," Corrao on direct examination gave an account of the above-discussed departure of the black supervisors which essentially corroborated that offered by plaintiff. On cross-examination, he offered a more detailed explanation for each departure. He recounted that he had given Walter Anderson, who ultimately left for a better job at New York Telephone, his first supervisory position by inviting him to work in his unit, and that he had been sorry to see him go (Tr. 196–97). Ms. Hamer also left AT & T for a promotion at New York Telephone (Tr. 197). Mr. Christian, he explained, had been requested by a manager in another AT & T unit because he had the same highly specific skills as a recently transferred supervisor (Tr. 197–99). With respect to Vivienne Crier, Corrao had voiced displeasure with her management decisions and had proposed a probationary period after which her status would be reevaluated. Crier, explaining that she had been happier in a technician's position than as a supervisor, instead proposed that she be demoted to a nonsupervisory job. Corrao followed this suggestion, and Crier subse-

quently led him to believe that she was pleased with the change (Tr. 199–202).

Corrao on cross-examination offered uncontested testimony that at his recommendation three of the black supervisors, Anderson, Hamer and Christian, had received above average salaries while working in his unit (Tr. 203). Plaintiff's salary had been "average" and Crier's salary had been average to slightly below average (*id.*).

Called as a defense witness, Brickmeier fleshed out the skeletal image of the winding down of Corrao's unit provided by plaintiff. Between 1988 and 1989 AT & T was going through significant downsizing due to its transformation from a regulated monopoly to a participant in a fiercely competitive market (Tr. 249). In addition, advances in technology had allowed consolidation into a single unit in Atlanta, Georgia, of the functions performed in White Plains by Corrao's unit and by several other similar units. As a result of this streamlining, jobs were going to be "eliminated or combined." (Tr. 250).

Called as a witness by defendant, Walter Anderson testified that he had gone to New York Telephone after working for Corrao for one and a half years. His new position offered more money and a better work atmosphere. Anderson stated that he had never been badly treated by Corrao because of his race, nor was he aware of Corrao ever having mistreated anyone for this reason (Tr. 259–60).

### C. *Evidence Relating to Corrao's Erroneous (or False) Statements*

Plaintiff recalled the events leading to his forced retirement as follows. On October 24, 1989, Corrao called plaintiff into his office and said that he had found eleven or twelve items on his corporate American Express card bill which looked like personal expenses (Tr. 53–54). Plaintiff then told Corrao that three of these charges were business related, and undertook to check the records he kept at home to determine the nature of the remaining items (Tr. 58). The two agreed to meet on October 30th further to discuss the matter. At that meeting, plaintiff acknowledged that some of the charges were for personal expenses, explaining that he had used the card for these charges, which included car rentals and hotel bills, in order to obtain a corporate employee discount (Tr. 58–59). Corrao informed plaintiff that he had violated the agreement he had signed when he originally obtained the card, and that as a result his job was in jeopardy. He suggested that plaintiff go home and consider accepting a retirement package that would entitle him to receive between $12,000 and $15,000 per year. Plaintiff responded that all his charges had been paid for, that he had never put company funds in jeopardy, and that he "knew of other people who had accumulated thousands of dollars and were given the opportunity to pay this money back." (Tr. 60). The meeting ended with an agreement that plaintiff would "go home, [and] wait for any retirement package." (*id.*).

Plaintiff tape-recorded his next two conversations with Corrao, which occurred on November 9th and 13th. The first of these involved considerable wrangling about whether or not plaintiff would agree to retire without a written representation of what his pension would be. It also included the following exchange (Pl.Ex. 2A p. 1):

Keeton: Okay, well, I will tell you what, Paul. I don't know what the solution is to this. I am the guy being forced off the payroll, okay? I am the guy who has to make a decision to resign, whether I should forcibly take this retirement package or whether or not—whatever—okay.

Corrao: Whatever is terminated.

During the November 13th meeting, Corrao asked plaintiff to settle his expense account and hand over his ID card. He informed plaintiff that he was being forced to "terminate" him from the payroll due to his failure to avail himself of the opportunity to "take the graceful way out." When plaintiff said that he would rather retire than be fired, Corrao returned his ID card and directed him to report to another office until he would go off the payroll on December 30th. As long as he retired, Corrao explained, plaintiff's record would not indicate the true reason for his departure (Pl.Ex. 2B p. 4–7).

Six months later, when plaintiff filed his EEOC complaint, Corrao's recollection of his discussions with plaintiff had materially changed (or he had then decided to prevaricate). Upon receipt of plaintiff's complaint, Mary Ott, AT & T's EEO Supervisor, interviewed Corrao to ascertain the facts. As a result of that interview, she reported that while the investigation of his credit card use may have influenced plaintiff's decision, he had voluntarily decided to take the enhanced AT & T retirement package, and that plaintiff had never been forced to retire.

In a deposition taken on February 26, 1992, Corrao repeated under oath the version he had given to Ms. Ott. Unaware of the existence of the tapes, he specifically denied almost every statement he was recorded as having made. In response to a question regarding whether or not he had given plaintiff the choice of retiring or being dismissed, he testified (Tr. 157):

> No. I did Mr. Keeton a favor, a tremendous favor. The fact is, I did not do the job I should have done. And I am a little ticked at my reward for that, to be perfectly honest.

Corrao was provided with the tapes before the trial started, and he testified that he had been surprised when he heard the recordings because he had not remembered the conversations as they were recorded. He explained (or attempted to explain) this discrepancy (Tr. 193):

> It was never my intention at that point in time to terminate Mr. Keeton. That's not what I was doing. What I was doing was trying to get him to say to me, "Paul, this is how I want you to proceed. Go ahead and complete your investigation. There is nothing there." Or, "If you wouldn't mind delaying your investigation and allowing me to take the package, I'd really appreciate that."
>
> That's what I was trying to get him to do. That's what I was trying to accomplish. I

was never trying to terminate Mr. Keeton at that point in time.

The "package" to which Corrao referred was an enhanced retirement plan, the availability of which AT & T had announced on October 18, 1989 (Tr. 151). Employees wishing to opt for this plan had to give notice to the company before November 30 (Tr. 152). The plan enabled retiring employees to become eligible to receive pensions immediately upon retirement rather than waiting for their pensions to vest at age 65 (Tr. 188). According to Corrao's estimate of a yearly pension of approximately $12,000 to $15,000, plaintiff's retirement at age 48 would yield between $200,000 and $255,000 before he reached age 65.

### Discussion[3]

#### The Motion for Judgment N.O.V.

■ It is perfectly clear to me that plaintiff had a justifiable grievance against defendant. After twenty-four years of loyal service, he seems to have been forced to retire simply to improve the defendant's chances of turning back the union's complaint as to the manner in which defendant had dealt with FC (Tr. 244–45). However, it is equally clear that race had nothing to do with the matter. There is no suggestion in the evidence that any white employee who had misused a corporate credit card had been treated more favorably than plaintiff. Although plaintiff established that at least half of the people charged with misuse of their cards remained employed by defendant corporation (Pl.Ex. 20), he offered no evidence suggesting a different racial composition of the more fortunate—as opposed to the less fortunate—half. That being the case, even if the jury were to have found that Corrao deliberately lied in order to cover up the injustice which had been done to plaintiff, the jury would not have been entitled to conclude that either the injustice or the lying was motivated by race.

**3.** Except for Brickmeier's unchallenged description of the reasons for terminating Corrao's unit, this "Discussion" will—in so far as it relates to the request for judgment n.o.v.—rely exclusively on plaintiff's testimony and exhibits offered by his counsel. As I indicated on oral argument of this motion, I accept Corrao's explanation for the

inaccuracies of his deposition testimony. However, my belief in that regard, although it influences the use of my discretion in considering defendant's request for alternative relief, is in no way relevant to my decision on the motion for judgment n.o.v.

As is made clear by, among other authorities, *St. Mary's v. Hicks, supra,* the authority to make such an inference only arises where a *prima facie* case has otherwise been established. Thus the Court observed (—— U.S. at ——, 113 S.Ct. at 2749, emphasis added):

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, *together with the elements of a prima facie case,* suffice to show intentional discrimination.

■ Accordingly, the question before me is whether or not the testimony concerning the departure of the four black supervisors establishes the necessary *prima facie* case.

I am aware of no authority, scholarly or judicial, which suggests that an inference may be drawn against an employer when employees go elsewhere "to take a better job." Nor am I aware of any authority suggesting that the lateral transfer of an employee from one unit to another can be deemed suspect absent some showing of disadvantage to the transferee.[4] This takes care of Anderson, Hamer and Christian.

With respect to Vivienne Crier, even wholly disregarding Corrao's seemingly reasonable explanation for her demotion, plaintiff offered no scintilla of evidence in any way linking this action with race.

The circumstance that all the departing black supervisors were replaced with whites is likewise meaningless. Plaintiff nowhere cites any authority for his belief that such replacement was significant, but as far as I can determine, he must have relied on *McDonnell Douglas v. Green* (1973) 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 and its progeny. The *McDonnell Douglas* formula is not a rule of evidence but a device which compels an employer to come forward with an explanation when some disadvantageous action has been taken (e.g. discharging or refusing to hire for an existing position) against a member of a protected class. As the pertinent cases make clear, once that explanation is adduced, the circumstances

giving rise to the "prima facie case" have no further effect. *St. Mary's v. Hicks* (1993) —— U.S. at ——, 113 S.Ct. at 2749; *Texas Dept. of Community Affairs v. Burdine,* (1981) 450 U.S. 248, 255, 101 S.Ct. 1089, 1094–95, 67 L.Ed.2d 207. Here, there is no evidence that Corrao took any disadvantageous action against any of the departing black supervisors. Accordingly the need for an explanation was never triggered, and the *McDonnell Douglas* doctrine never came into play.

Nor is it significant that, as plaintiff testified, Christian said that he had departed because Corrao had told him that he had "no future" in his unit. In fact, neither Christian nor anyone else had "a future" in the unit which was about to be dissolved. If Christian had been white, Corrao would have been obliged (unless for some reason he had wanted to deceive) to give identical advice.

In brief—wholly disregarding any explanation defendant may have offered—the evidence concerning the departing black supervisors boils down to this: in 1988, when plaintiff (and presumably others) had been drawn into Corrao's unit because of its promise of technological training, it included a total of four black supervisors; and that one year later, when that promise had been eliminated by the combined forces of technological development and financial constraints, four of those had gone elsewhere. This scenario hardly suggests racial discrimination.

### The Motion for a New Trial

■ Regardless of what may have been plaintiff's feeling about how the credit card episode was handled (as to which he points to no evidence of racial motivation), there was no basis for accusing Corrao of being a racist. Beyond that, the evidence presented by plaintiff strongly suggests that Corrao was precisely the opposite of a racist.

The foregoing discussion with respect to the judgment n.o.v. establishes two things: (1) that the only purported basis for plaintiff's accusation against Corrao is the departure from his unit of the four black supervi-

---

4. Plaintiff argued to the jury that Christian was harmed by the transfer because it forced him to make a longer commute (Tr. p. 5). Had he wanted to continue with the work done by Corrao's unit, he would have had to have moved to Atlanta, Georgia.

sors; and (2) that such departures were wholly without racial significance.

What, then, in the evidence affirmatively suggests that Corrao was *not* a racist? First, take the evidence about the departure of the black supervisors. I take judicial notice that the 5–5 racial mix of Corrao's unit was not typical of all AT & T employees at the supervisory level. Had such been the case in an organization as powerful and omnipresent as defendant corporation, it would most certainly have been a matter of public discussion. Plaintiff gave no indication as to how that unusual situation came about; he simply said that it was in existence when he joined the unit. There are only two possibilities: (1) Corrao inherited the situation from his predecessor; or (2) he created it. Proof of the first circumstance would have strengthened plaintiff's argument, and plaintiff (who was able to testify about the number of years each of his fellow black supervisors had been employed by defendant corporation, and therefore could have been expected to have known when they joined Corrao's unit) must have known whether or not such evidence was available. I therefore conclude that such evidence did not exist, and that the black supervisors had been attracted to the unit during Corrao's stewardship. This strongly suggests that Corrao was anything but a racist.

This suggestion is supported by plaintiff's deposition testimony that had never felt discriminated against by Corrao prior to the first discussion about his card use (Tr. 118), and by his recollection on cross-examination that after leaving defendant corporation he had heard that a black employee who had been working in Corrao's unit subsequently had been promoted to a supervisory position (Tr. 123). The assertion that Corrao acted with racial animus is also inconsistent with plaintiff's testimony that before joining Corrao's unit he had been told by Walter Anderson that if he wanted to gain expertise with digital technology, the unit was a "good place to work." (Tr. 118).

Turning to the evidence offered by defendant, I accept Corrao as a trustworthy witness. His testimony (which was uncontradicted and could easily have been refuted if untrue) clearly established that his unit was by no means operated on a racist basis. On the contrary, it showed that black supervisors in Corrao's unit received—at his recommendation—salary treatment that ranged from above average for three supervisors (Anderson, Hamer and Christian), average for one (plaintiff), and average to below average for another (Crier). This is hardly the pattern that would be established by one intent on ridding his office of minority supervisors.

Furthermore, Walter Anderson specifically testified that before he left defendant corporation for a promotion at New York Telephone, he had never felt mistreated by Corrao because of his race; and that he was not aware of anyone else ever having perceived or commented on such mistreatment (Tr. 258–61).

Finally, there is the circumstance that plaintiff's counsel claimed attorney-client privilege rather than reveal the reason for the paucity of witnesses. Judge Feinberg, in *U.S. v. Property Located at 15 Black Ledge Drive* (2d Cir.1990) 897 F.2d 97, 103, explained that, in a civil case, an unfavorable inference can be drawn against one who asserts a Fifth Amendment privilege. If such be true of that constitutional privilege, the same must be so with respect to the judge-made rule here involved. I therefore conclude that the gist of plaintiff's communications with his counsel was that too many inquiries into the facts might well have torpedoed any claim that Corrao was a racist.

In brief, I conclude that plaintiff's attempt to impute racism to Corrao's conduct was an outrage, and that to allow a verdict so finding to stand would be an egregious miscarriage of justice.

### Plaintiff's Claim of Waiver

■ There are two conclusive answers to plaintiff's claim that defendant has waived its right to seek judgment n.o.v. In the first place, defendant carefully reserved its technical right to seek such a judgment. At the close of plaintiff's case defendant's counsel consented to my suggestion that we postpone argument until some more appropriate time,

but only on the condition that it was clear that he was "preserving [the] motion at this point." (Tr. 234). Upon renewing the motion at the close of its presentation of evidence, defendant's counsel, although he never enthusiastically argued the point, specifically asserted that plaintiff had failed to establish a *prima facie* case (*supra* at p. 174).

■ Secondly, and more importantly, plaintiff could not possibly suggest a reason for claiming that he had been prejudiced by defendant's failure to emphasize the point. Plaintiff's memorandum aptly states the reason behind the rule requiring a timely motion for a directed verdict (at p. 17–18):

> By precluding a party who loses a trial from raising a ground for relief for the first time in a motion for judgment n.o.v., a court prevents that party from using the motion as a trap after it is too late for the winner of the verdict to cure any alleged deficiencies of proof. *Oliveras v. American Export Isbrandtsen Lines, Inc.* (2nd Cir.1970) 431 F.2d 814, 816–17.

So far as I'm aware, the first time defendant made known his disinclination vigorously to press the *prima facie* case argument was at our above described off-the-record conference. Plaintiff can not possibly devise a theory suggesting that any different strategy which defendant's counsel might then have suggested would have brought about a cure of "the alleged deficiencies of proof." By February 11, 1993, when I agreed to take the case, thirty-three months had passed since the complaint had been filed with the EEOC, and there had been approximately ten months of discovery under the supervision of a Magistrate Judge. Moreover, when asked after trial why more witnesses had not been produced, his counsel—far from suggesting that she had been duped by defendant's tactics—responded that one of the critical witnesses had not even been interviewed, and that the attorney-client privilege prevented her from explaining the absence of other witnesses.

### The Motion for Recusal

■ Upon announcing my discovery of a possible conflict of interest, I invited the parties to make a motion for disqualification,

but indicated that I would most likely deny it. My reason for such indication was that I had not seen or heard of a case either requiring or countenancing disqualification under the peculiar circumstances at bar. Nothing has since occurred to change my view.

My own research reveals that there is no controlling Second Circuit authority. But compare, e.g., *DeLuca v. Long Island Lighting Co., Inc.* (2nd Cir.1988) 862 F.2d 427, 428–9. Plaintiff's "Memorandum of Law In Support of Motion for Disqualification," has come up with only three appellate cases: *In re Virginia Electric & Power Co.* (4th Cir. 1976) 539 F.2d 357; *In re New Mexico Natural Gas Antitrust Litigation* (10th Cir.1980) 620 F.2d 794; *Davis v. Xerox* (9th Cir.) 811 F.2d 1293, *cert. denied,* 484 U.S. 966, 108 S.Ct. 457, 98 L.Ed.2d 397 (1987), *reh'g denied* 486 U.S. 1019, 108 S.Ct. 1761, 100 L.Ed.2d 222 (1988). The first two of these reversed district judges for having improperly recused themselves, and the third affirmed a district judge who had declined to do so. All three are distinguishable from the case at bar and from each other. However, each of them tries to suggest a formula which would put some rationality in the statutory mandate for compulsory recusal. Each—in one way or other—concludes that recusal should be compulsory only if the judge him or herself could be financially affected by the outcome of the litigation over which he or she was presiding.

In *Virginia Electric,* in mandamusing a district judge to unrecuse himself, the Fourth Circuit observed (539 F.2d at 388):

> If a judge has an ownership interest in a party . . . it matters not at all whether the interest is a large or infinitesimally small amount. . But that is not so with respect to "any other interest." The difference is a sensible one.

In *New Mexico,* the Tenth Circuit in reversing a district judge for having recused himself, formulated the rule as follows (620 F.2d at 796, emphasis supplied):

> The statute differentiates between two kinds of interests. If the judge has direct ownership, legal or equitable, then disqualification is required regardless of the size of the interest, unless one of the specified

exceptions applies. *On the other hand, an interest not entailing direct ownership falls under "other interest," and requires disqualification only if the litigation could substantially affect it.*

In *Davis*, the Ninth Circuit, in affirming a district judge who had declined to recuse himself, simply noted that "[t]he judge's own financial welfare would be advanced not one whit whichever way he decided." 811 F.2d at 1293.

The foregoing rule would ordinarily require a judge in my position to recuse himself. In New York at least, under Surrogates Court Procedure Act § 2309, a trustee's commission is based on various estimates of the trust's value. It would follow that his or her financial interest would be affected—however slightly—by the rise or fall of any investment in the trust's portfolio. However, so far as concerns judges in my situation, the Congress in 1991 changed all that. By enacting 5 U.S.C. §§ 501–504, Congress prohibited all federal judges from accepting outside compensation which exceeds 15% of their official salaries. In my case, for example, in 1992 such permitted outside compensation would be limited to $19,425,[5] which is somewhat less than half of what I would have been entitled to under the Surrogates Court Procedure Act. Accordingly, to adopt the 9th Circuit's language, it can be said with mathematical certainty that my "own financial welfare would be advanced not one whit whichever way [I] decided."

Finally, it may be observed that it is not really necessary to decide to what extent—if any—I might be affected by the trust's investment in the defendant. My grant of the judgment n.o.v. is based on a legal decision which the Court of Appeals must review *de novo*. Should that Court affirm, plaintiff's complaint would be dismissed on that Court's direction, not on mine. It would be absurd—especially in light of the crisis the Southern District now faces due to the existence of so many vacancies—to require another judge to

devote the time and energy required for the preliminary work necessary to present the matter to the Court of Appeals for decision. Also, there are two possible results of the inevitable appeal: (1) a final judgment for either party or (2) a new trial. In the first of these, all that would remain would be whatever needed to be done incident to entry of judgment. Any questions arising therefrom could—without great inconvenience to anyone—be assigned to a magistrate judge with instructions to report to some other district judge. Should the appeal result in a new trial I would, pursuant to Local Rule 18 of the Rules of the Division of Business Among District Judges of the Southern District, recuse myself regardless of the existence or absence of a conflict.[6]

### Conclusion

Defendant's motion for judgment notwithstanding the verdict is granted, as is the motion for the alternative relief of a new trial. The motion that I recuse myself is denied. With respect to the latter two non-final or non-dispositive orders, to avoid the procedural difficulties suggested by *Kirschner v. Office of the Comptroller of New York*, (2d Cir.1992) 973 F.2d 88, 95 n. 7, I certify, pursuant to 28 § 1292(b), that there is a question as to each of them upon which reasonable minds might differ and if the Court of Appeals should reach it, the ultimate disposition of this case would be hastened by an immediate ruling. The Clerk is directed to enter judgment dismissing the complaint. However, entry of such judgment is stayed for ten days to permit plaintiff to perfect an appeal to the Court of Appeals. If such an appeal is perfected, the stay shall be extended until such time as the Court may dispose of the appeal.

SO ORDERED.

---

5. This figure would differ insubstantially for 1993.

6. That rule provides that "in case the assigned judge is disqualified *or upon request, if said judge*

*has presided at a ... former trial* of the case ... the assignment committee shall transfer the case by lot."